IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND TRANSIT                      :
ADMINISTRATION,                       :
   Plaintiff                          :
                                       :
   v.                                 :    Civil No. AMD 04-3650
                                       :
NATIONAL RAILROAD PASSENGER:
CORPORATION,                          :
   Defendant                          :
                                 :   :   :
                                       :
MARYLAND TRANSIT                      :
ADMINISTRATION,                       :
   Plaintiff                          :
                                       :
   v.                                 :    Civil No. AMD 04-3683
                                       :
NATIONAL RAILROAD PASSENGER:
CORPORATION,                          :
   Defendant                          :
                                 :   :   :
                                       :
NATIONAL RAILROAD PASSENGER:
CORPORATION,                          :
   Plaintiff                          :
                                       :
   v.                                 :    Civil No. AMD 05-403
                                       :
MARYLAND TRANSIT                      :
ADMINISTRATION,                       :
   Defendant                          :

...o0o...

## AMENDED MEMORANDUM OPINION

These three cases arise out of a pair of arbitration proceedings between the parties,

Maryland Transit Administration ("MTA") and National Railroad Passenger Corporation

("AMTRAK"). Two distinct arbitration awards are at issue. In the first award, a majority of the arbitration panel ruled in favor of MTA, and concluded that a train collision near the Baltimore train station was the fault, i.e., resulted from gross negligence, of an AMTRAK locomotive engineer. In case number AMD 04-3683, MTA seeks confirmation of that award pursuant to the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 9.[1] The court concludes that MTA's petition is untimely, and thus shall dismiss that case without prejudice.

In the second award, the majority of a different panel of arbitrators concluded that notwithstanding the first arbitration award, MTA had contractually bound itself to procure liability insurance to protect both itself and AMTRAK from losses arising out of accidents of the type involved here. Accordingly, the panel concluded, MTA was required to provide insurance coverage to AMTRAK for some of the losses occasioned by the locomotive engineer's gross negligence. In cases numbered AMD 04-3650 AMD 05-403, respectively, MTA seeks an order vacating, and AMTRAK seeks an order confirming, the second arbitration award. For the reasons stated herein, the court shall confirm the second arbitration award.

---

[1]Title 9, § 9 states, in pertinent part:
If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.  If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.
9 U.S.C. § 9.

I.

MTA, formerly known as the *Mass* Transit Administration, is a part of the Maryland

Department of Transportation. AMTRAK is a corporation organized under the Rail

Passenger Act of 1970, 45 U.S.C. §§ 501, *et seq.*, and the laws of the District of Columbia.[2]

The parties are signatories to an agreement dated January 1, 1994 ("the Agreement"),

pursuant to which AMTRAK succeeded CSX Transportation, Inc., as a provider of

equipment, personnel, and various services to MTA in respect to the operation of commuter

rail passenger service between Perryville, Maryland, and Washington, D.C.

The Agreement contains a broad arbitration clause, providing as follows, in part:

> Any dispute, claim, or controversy between the parties hereto relating
> to the interpretation, application, or implementation of this Agreement shall
> be submitted to binding arbitration . . .
> Any arbitration award rendered hereunder shall be final and binding
> upon the parties. Judgment upon any such arbitration award may be entered
> in any United States District Court having jurisdiction over the parties.

Agreement, § 22.

Section 9 of the Agreement is entitled "Risk of Liability." It provides as follows, in

relevant part:

> Except as provided in the second paragraph hereof, [MTA] agrees to indemnify and
> save harmless Amtrak . . . and other third parties to the extent Amtrak is obligated to
> indemnify or save harmless such third parties, irrespective of negligence or fault of Amtrak
> or such third parties, for all damage or liability for personal injury, death, or property damage
> which would not have been incurred but for the existence of [the commuter rail service]

---

[2]As the United States owns more than one half the stock of AMTRAK, subject matter
jurisdiction lies in these cases pursuant to 28 U.S.C. §§ 1331 and 1349. *Hollus v. Amtrak
Northeast Corridor,* 937 F.Supp. 1110, 1113 (D.N.J.1996), *aff'd,* 118 F.3d 1575 (3d Cir.1997).

provided by Amtrak; provided, however, that [MTA] shall have no responsibility to Amtrak or any other party for injury or death to Amtrak employees engage directly in the provision of the [commuter rail service].

[MTA]'s agreement to indemnify and save harmless Amtrak, as set forth in the first paragraph hereof, shall not apply to any claim for damages or for any liability for personal injury, death, or property damage, including damage to Amtrak property, (a) which is caused by the gross negligence, or willful or wanton conduct of Amtrak as agreed by the parties or determined by arbitration pursuant to Section 22 of this Agreement . . . .

*Id.*, § 9.

Finally, section 10 of the Agreement is entitled "Liability Insurance." It provides as follows, in relevant part:

(a) Liability Insurance
[MTA] shall procure and maintain for the duration of this Agreement, liability insurance, with combined single limits for bodily injury and property damage of at least $150,000,000 per occurrence, with Amtrak and [MTA] designated as the named insureds. Such insurance shall cover the Named Insureds' liability for injury or death of persons and damage to property, including coverage for punitive or exemplary damages, arising out of the [commuter rail service] . . . . [MTA] shall have the right to self-insure for any part of the insurance procurement up to $5,000,000 per occurrence. Amtrak shall have the right of approval that the insurance placements and self-insurance arrangements adequately protect Amtrak against liability for bodily injury, death and property damages, which approval shall not be unreasonably withheld.

*Id.*, §10.

On June 17, 2002, at a location just south of the Baltimore train station, a northbound AMTRAK intercity passenger train destined for New York proceeded through a stop indication and collided with a southbound commuter train, causing significant damage. Unable to agree on the allocation of fault for the accident, and pursuant to the arbitration clause in the Agreement, the parties proceeded to arbitration under a bifurcated process

before two separate arbitration panels. The issue presented to the first panel was whether, under §9 of the Agreement, the AMTRAK engineer was guilty of gross negligence in causing the collision, thereby relieving MTA of any responsibility to indemnify AMTRAK. In a 2-1 decision issued on September 22, 2003 ("the first arbitration award"), and over a vigorous dissent, the arbitration panel, applying Maryland law, found and concluded that the engineer committed gross negligence.[3]

Notwithstanding the September 22, 2003, award, AMTRAK asserted that, pursuant to §10 of the Agreement, MTA was required to provide insurance coverage to AMTRAK for the June 2002 accident. MTA denied that §10 could be read to impose such an obligation upon it in light of the first arbitration award, and as a matter of contract interpretation. Accordingly, the parties once again proceeded to arbitration. In defending against AMTRAK's claim for insurance coverage in the second arbitration proceeding, MTA asserted the following defenses: (1) claim preclusion; (2) estoppel/waiver; (3) failure to give adequate notice of the claim; and (4) the June 2002 accident did not "arise out of" the operation of the commuter rail service as required by §10 of the Agreement ("Such insurance shall cover the Named Insureds' liability for injury or death of persons and damage to property, including coverage for punitive or exemplary damages, arising out of the [commuter rail service]").

---

[3]The majority concluded: "1. The Collision resulted solely from Amtrak's gross negligence; and 2. Pursuant to the terms of the Operating Agreement, MTA is not required to indemnify Amtrak for any damages or liabilities resulting from the Collision and MTA may recover from Amtrak for its damages and liabilities resulting from the Collision."

On October 19, 2004, again in a 2-1 split decision issued over a vigorous dissent ("the second arbitration award"), the second arbitration panel agreed with AMTRAK and found and concluded that under §10 of the Agreement, MTA's obligation to provide insurance to AMTRAK subsisted notwithstanding the fact that the AMTRAK engineer was guilty of gross negligence as determined by the first arbitration panel. The second arbitration panel further found that none of the affirmative defenses offered by MTA had merit. Finally, the second arbitration panel interpreted the phrase "arising out of" as suggested by AMTRAK and rejected MTA's more limited construction of the term.

MTA filed an action in this court to vacate the second arbitration award on November 17, 2004, and an action to enforce the first arbitration award on November 18, 2004. AMTRAK filed an action to confirm the second arbitration award on November 8, 2004, in the United States District Court for the District of Columbia, and that case was transferred to this district on February 10, 2005. The court consolidated the three cases.

## II.

The FAA sets out four limited statutory grounds on which a district court can vacate an arbitration award. 9 U.S.C. § 10(a)(1)-(4);[4] *see also Remmey v. PaineWebber, Inc.*, 32

---

[4] The United States Code, FAA, Title 9, § 10 states, in pertinent part:
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
　　(1) Where the award was procured by corruption, fraud, or undue means.
　　(2) Where there was evident partiality or corruption in the arbitrators, or either of them.
　　(3) Where the arbitrators were guilty or misconduct in refusing to

(continued...)

F.3d 143, 146 (4th Cir. 1994)(explaining that Congress has limited the statutory grounds upon which arbitration can be vacated to 9 U.S.C. § 10(a)(1)-(4)), *cert. denied*, 513 U.S. 1112 (1995).  In addition, a court may overturn a legal interpretation of an arbitration panel if "it is in manifest disregard for the law." *See, e.g., Upshur Coals Corp. v. United Mine Workers of America*, 933 F.2d 225, 229 (4th Cir. 1991) (citing *American Postal Workers v. United States Postal Serv.*, 682 F.2d 1280, 1284 (9th Cir. 1982), *cert. denied*, 459 U.S. 1200 (1983)); *Remmey*, 32 F.3d at 149; *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.,* 142 F.3d 188, 193 (4th Cir.)("Federal courts may vacate an arbitration award only upon a showing of one of the grounds listed in the [FAA], or if the arbitrator acted in manifest disregard of law.") (citing *In re A.H. Robins Co., Inc.,* 197 B.R. 513, 516 (E.D. Va. 1994)), *cert. denied*, 525 U.S. 876 (1998).

The Fourth Circuit has emphasized "the limited scope of judicial review that courts are permitted to exercise over arbitral decisions." *Remmey*, 32 F.3d at 146; *see Upshur Coals Corp.*, 933 F.3d at 228 ("An arbitrator's award is entitled to a special degree of deference on judicial review."); *Apex Plumbing Supply, Inc.,* 142 F.3d at 193 ("Review of an

---

[4](...continued)
postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

    (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

    (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrator.

9 U.S.C. §10(a).

arbitrator's award is severely circumscribed."). "Limited judicial review is necessary to encourage the use of arbitration as an alternative to formal litigation.  This policy is widely recognized, and the Supreme Court has often found occasion to approve it." *Remmey*, 32 F.3d at 146 (citations omitted); *see Unites States v. Aegis/Zublin Joint Venture*, 869 F. Supp. 387, 391 (E.D. Va. 1994) ("[T]he Court's jurisdiction under the [FAA] is strictly limited to avoid frustrating the purpose of arbitration--avoiding litigation." (citing *Jardine Matheson & Co., Inc. v. Saita Shipping, Ltd.*, 712 F. Supp. 423, 426 (S.D.N.Y. 1989))).

The Fourth Circuit has further explained the bases for the highly deferential standard of review of arbitration awards as follows:

> A policy favoring arbitration would mean little, of course, if arbitration were merely the prologue to prolonged litigation.  If such were the case, one would hardly achieve the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." . . . Opening up arbitral awards to myriad legal challenges would eventually reduce arbitral proceedings to the status of preliminary hearings. Parties would cease to utilize a process that no longer had finality. To avoid this result, courts have resisted temptations to redo arbitral decisions. As the Seventh Circuit put it, "arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party . . . ."

*Remmey*, 32 F.3d at 146 (citations omitted).

In reviewing arbitral awards, therefore, district and appellate courts are confined to ascertaining "whether the arbitrators did the job they were told to do-- not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Id.* (internal quotation marks omitted) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Transportation Communications Int's Union*, 973 F.2d 276, 281 (4th Cir. 1992)). "Courts are not free to

overturn an arbitral result because they would have reached a different conclusion if presented with the same facts." *Id*. As the Fourth Circuit has determined, an arbitration award is enforceable "'even if the award resulted from a misinterpretation of law, faulty legal reasoning or erroneous legal conclusion,' . . . and may only be reversed 'when arbitrators understand and correctly state the law, but proceed to disregard the same.'" *Upshur Coals Corp.*, 933 F.2d at 229 (citations omitted); *see Aegis/Zublin Joint Venture*, 869 F. Supp. at 391.

III.

A.

Under the FAA, "at any time within one year after the award is made any party to the arbitration may apply . . . for an order confirming the award." 9 U.S.C. § 9. The first arbitration award was rendered on September 22, 2003. MTA did not file its petition to enforce the award , however, until November 18, 2004, more than one year later. AMTRAK asserts, therefore, that the petition to confirm the first award is untimely and should not be considered. Citing *Sverdrup Corp. v. WHC Constructors, Inc.,* 989 F.2d 148, 151-56 (4th Cir.1993), MTA contends that the one year period is not a statute of limitations and that therefore its belated petition to enforce the first arbitration award must be considered.

The court stated the following to the parties in an earlier order:

> While I am of course cognizant of the binding nature of *Sverdrup Corp. v. WHC Constructors, Inc.,* 989 F.2d 148, 151-56 (4th Cir.1993), holding that the one year period within which a petition to confirm an arbitration award "may" be filed pursuant to the Federal Arbitration Act is "permissive," I am

also of the view that the Fourth Circuit is very likely to reconsider that holding in light of *Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152 (2d Cir. 2003)(noting that the Fourth Circuit's decision in *Sverdrup Corp.* has been seriously undermined by the Supreme Court's later decision in *Cortez Byrd Chips, Inc. v. Bill Harbert Construction Co.*, 529 U.S. 193 (2000), and concluding that the one year period is a statute of limitations). In any event, the "award" in the first arbitration decision was merely a declaratory order and . . . I do not believe the issues arising under the second arbitration award are inextricably intertwined with the issues presented in the first arbitration award.[5]

The court adheres to its view that *Sverdrup Corp.* is a candidate for reconsideration by the

Fourth Circuit and, accordingly, shall dismiss without prejudice as untimely MTA's petition

to enforce the first arbitration award.

---

[5]In *Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152, 158 (2d Cir.2003), the Second Circuit stated:

> [W]e read the word "may" in section 9 as permissive, but only within the scope of the preceding adverbial phrase: "[a]t any time within one year after the award is made." We therefore hold that section 9 of the FAA imposes a one-year statute of limitations on the filing of a motion to confirm an arbitration award under the FAA.

*Id. See generally* Teresa L. Elliott, *Conflicting Interpretations of the One-Year Requirement on Motions to Confirm Arbitration Awards*, 38 CREIGHTON LAW REV. 661 (April 2005)(examining circuit split and urging adoption of the Fourth Circuit's view that the one year period is not a statute of limitations).

As the court suggested to the parties earlier, the dismissal of MTA's petition to enforce the first arbitration award is of no moment. First, as mentioned *infra* n. 6, MTA now takes the position that neither the first nor the second arbitration panel had adjudicatory jurisdiction over the parties' dispute. Thus, MTA effectively seeks by that argument to withdraw its petition to enforce the first arbitration award. Second, even without court action on the first arbitration award, that award is a *fait accompli*, and whether the court vacates or confirms it, there remains the real dispute over the enforceability of the second arbitration award. In other words, it is clear that MTA filed its belated petition to enforce the first arbitration award merely in an attempt to shore up its arguments in support of its petition to vacate the second arbitration award.

In any event, as mentioned in text, this court shall dismiss without prejudice MTA's petition to enforce the first arbitration award in view of the possibility that MTA could bring an action at law on the "same claim." *See Photopaint Technologies, LLC,* 335 F.3d at 159 (acknowledging that an action at law is a valid alternative means of enforcing an arbitral award).

B.

Application of the appropriate standard of review to the issue of whether to confirm

or vacate the second arbitration award, which compels MTA to provide insurance coverage

to AMTRAK for the June 2002 accident, requires the court to reject MTA's challenge. Even

viewed in the light most favorable to MTA's contentions in mounting its challenge to the

second arbitration award, the arbitrators have committed, at most, mere errors of law. Such

a ground does not provide a justification for vacating an arbitral award. *National Wrecking*

*Co.*, 990 F.2d at 961-62 ("The arbitrator's award may be erroneous, but, even if it is, it does

not evidence a manifest disregard for the [law]").[6] Plainly, the second arbitration award (a

_____

[6]For the first time throughout the proceedings, in its opening brief filed in this court, MTA asserted a defense that it had failed to raise before the arbitration panel, namely, sovereign immunity, based on an alleged statutory "evolution" over several decades in Maryland law, as set forth in myriad provisions found in Maryland state procurement law. In short, MTA now claims that the arbitrators "exceeded their powers" because they should have recognized that the Agreement between MTA and AMTRAK was a "state procurement contract" ( and thus called for the application of state administrative and judicial review proceedings rather than arbitration), and should have refused to arbitrate the parties' dispute, notwithstanding the plain language of the arbitration clause set forth in the Agreement, and notwithstanding MTA's full participation, with the assistance of counsel from the Office of the Attorney General, in the negotiation of the Agreement and in the arbitration proceedings called for thereunder. The court offered to remand the second arbitration award to the arbitration panel to permit the parties to litigate this newly-discovered issue before the arbitration panel. *See* Memorandum to Counsel dated May 22, 2005. AMTRAK vigorously disputes MTA's eleventh hour contentions regarding sovereign immunity but it accepted the court's proposed remand, suggesting that some additional discovery might be appropriate; MTA rejected the court's proposal outright.

Accordingly, MTA having voluntarily participated in the arbitration proceedings after voluntarily entering into a binding agreement to do so, having failed to raise the issue of sovereign immunity before the arbitration panels, and having declined this court's invitation to present the issue to the arbitration panel upon a remand, the court regards the issue as waived by MTA. *See In re Pegasus Gold Corp.,* 394 F.3d 1189, 1195 (9th Cir.2005) ("[Sovereign] immunity is not absolute, however, and 'a State may waive its sovereign immunity by consenting to suit.' *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S.

(continued...)

copy of which is attached to this Memorandum Opinion) demonstrates that the arbitration panel diligently and conscientiously considered MTA's affirmative defenses and contract interpretation contentions, identified the correct principles of controlling Maryland law which informed its decision, and reached well-considered, though disparate, legal conclusions in the light of the (largely undisputed) facts underlying those conclusions. Accordingly, the petition to vacate shall be denied and the petition to confirm shall be granted.

IV.

For the reasons set forth herein, case number AMD 04-3683 shall be dismissed without prejudice and the second arbitral award shall be confirmed. An Order follows.


Filed: June 6, 2005                                    _____/s/_____

                                                       ANDRE M. DAVIS
                                                       UNITED STATES DISTRICT JUDGE

---

[6](...continued)
666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). *Waiver will generally exist where the State either voluntarily invokes jurisdiction or makes a clear declaration that it intends to submit itself to jurisdiction. Id.* at 675-76, 119 S.Ct. 2219.")(emphasis added); *Hardie v. United States*, 367 F.3d 1288 (Fed.Cir. 2004)(rejecting claim of the United States that sovereign immunity bars compelled arbitration); *New Hampshire v. Ramsey*, 366 F.3d 1, 15-18 (1st Cir. 2004)(finding partial waiver of sovereign immunity by state's litigation conduct, including consent to binding arbitration, and noting that "the state, having gained the advantage that it sought, is bound by the choice that it made.").

Attachment to Memorandum Opinion in AMD 04-3650,
AMD 04-3683, and AMD 05-403

ARBITRATION AWARD OF OCTOBER 19, 2004

| | | |
|---|---|---|
| **In the Matter of the Arbitration** | : | **Before Arbitrators,** |
| **Between AMTRAK and the** | : | **William C. Miller,** |
| **MARYLAND TRANSIT** | : | **Joseph S. Crociata** |
| **ADMINISTRATION** | : | **and Charles A. Spitulnik** |

## ARBITRATION DECISION

### *Introduction*

Gilbert O. Mallery by letter dated October 30, 2003, to Simon Taylor of the MARC Train

Service of the Maryland Transit Administration (MTA) made a demand that MTA provide

insurance coverage on behalf of Amtrak for all of the liability claims against Amtrak for

(1) injuries to passengers on both the Amtrak and MARC trains, (2) injuries to employees on the

Amtrak train, and (3) property damage to the MARC train arising out of the train collision that

occurred on June 17, 2002. This demand was made pursuant to Section 10(a) of the Agreement

between the Maryland Department of Transportation and the National Railroad Passenger

Corporation ("Amtrak") dated January 1, 1994 (the "Operating Agreement"). By letter dated

November 4, 2003, Mr. Taylor on behalf of MTA denied Amtrak's demand for insurance

coverage on the basis that the accident in question did not "arise out of MARC Service" since it

was caused, as found in the Arbitration Decision of September 25, 2003 ("Arbitration One"), by

the gross negligence of Amtrak's engineer. Thus, the issue for decision by this arbitration panel

was drawn. Your arbitrators were then designated in accordance with Section 22 of the

Operating Agreement.

Exhibit C

*1.*     *__The issues__*

The issues for determination are as follows:

1.     Does Section 10(a) of the Operating Agreement require MTA to provide insurance coverage for (1) injuries to passengers on both the Amtrak and MARC trains, (2) injuries to the employees of the Amtrak train, and (3) property damage to MARC train that resulted from the train collision of June 17, 2002?

To answer question 1, it is necessary for the panel to answer questions 2, 3, 4 and 5.

2.     Is Amtrak's demand for insurance coverage under Section 10(a) of Operating Agreement barred by *res adjudicata* by Arbitration One decision?

3.     Should Amtrak's demand for insurance coverage be denied on the basis of estoppel and/or waiver?

4.     Should Amtrak's demand for insurance coverage be denied because of its failure to give timely and adequate notice of this claim?

5.     Should Amtrak's demand for insurance coverage be denied on the basis that the accident of June 17, 2002 did not "arise out of MARC Service"?

*2.*     *Amtrak's claim for insurance coverage under Section 10(a) of the*
         *__Operating Agreement is not barred by res adjudicata.__*

By letter dated October 8, 2002, from Callista M. Freedman, Esq., to Mr. David D. James, Claims Adjuster for Amtrak, MTA submitted the issue of whether the gross negligence of Amtrak caused the train collision of June 17, 2002, if so, whether this relieved MTA from its obligation to indemnify Amtrak for damages to the Amtrak equipment under Section 9 of the Operating Agreement and what is the amount of damage attributable to Amtrak. On October 16, 2002, D. Scott Morgan, Esq., Associate General Counsel to Amtrak, responded to

2

Ms. Freedman's letter and submitted the additional issue of whether MTA is required to indemnify Amtrak for injury claims involving Amtrak employees that are not involved in the provision of MARC service.

On September 22, 2002, the Arbitration One panel entered the following Decision and Award,[1] with one member dissenting:

>    1.    The Collision resulted solely from Amtrak's gross negligence; and
>
>    2.    Pursuant to the terms of the Operating Agreement, MTA is not required to indemnify Amtrak for any damage or liabilities resulting from the Collision and MTA may recover from Amtrak for its damages and liabilities resulting from the Collision.

*Arbitration Award, Joint Stip. Ex. A at 11.*

MTA contends that since Amtrak could have submitted the Section 10(a) issue to the Arbitration One panel it is barred by *res adjudicata* from submitting this issue to an Arbitration Two panel.  MTA quite correctly defines *res adjudicata* in its Pre-Hearing Brief under Maryland law:

>    [A] judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, **not only as to all matters that have been decided in the original suit, but as to all matters, which with propriety could have been litigated in the first suit.**

*MTA's Pre-Hearing Brief at 5* (citing *Warwick Corp. v. Md. Dep't of Transp.*, 573 F. Supp. 1011 (D. Md. 1983)).

As MTA points out in its Pre-Hearing Brief, in determining whether to apply the doctrine of *res adjudicata*, there are three questions to be answered:

>    1.    Is the issue presented in the current action identical to the one determined in the prior adjudication?
>
>    2.    Are the parties in the present litigation the same or in privity with the parties in the earlier dispute?

---

[1] At the request of the parties, Arbitration One did not assess damages.

3.     Was there a final judgment on the merits in the initial action?

*MTA's Pre-Hearing Brief at 5* (citing See *Nicholson v. Unsatisfied Claim and Judgment Fund Board*, 290 A.2d 384, 386, 265 Md. 453, 458 (Md. 1972)).

MTA argues that we must answer these questions in the affirmative. First, the issues in Arbitration One and Two are basically the same, *i.e.*, who shall bear the costs associated with the personal injuries and property damage caused in the June 17, 2002 train collision. Second, the parties are the same. Finally, the Decision and Award of Arbitration One constituted a final judgment. On page 11 of its Pre-Hearing Brief, MTA states:

> If this case were in court rather than arbitration, applicable court rules would have required to Amtrak to present the argument it raises here as a counterclaim in the original arbitration.

*MTA's Pre-Hearing Brief at pg. 11.*

Although Maryland Rule 2-331(a) uses the word "may" in reference to a party asserting a counterclaim, MTA argues that, "[if] this case were in court" Amtrak's claim under Section 10(a) should be treated as a compulsory counterclaim. In *Higgins v. Barnes*, 530 A.2d 724, 732, 310 Md. 532, 549 (Md. 1987) the Court of Appeals cites Section 22 of the Restatement (Second) of Judgments (1982) as authority for the proposition that, a party would be precluded from bringing a later action for its failure to file a counterclaim if

> the relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.

*MTA's Pre-Hearing Brief at 12* (citing See *Rowland v. Harrison*, 577 A.2d 51, 54-55 (Md. 1990, commenting on *Higgins v. Barnes*)).

---

[2]   MTA's argument for a strict application of this Rule is difficult to reconcile with the Parties' continuing reliance upon the less benefits of arbitration. Even the dissent notes that the Parties have mutually reserved the right to submit additional issues in further proceedings not inconsistent with this Opinion (*see Dissent, n.4*).

However, a decision in Arbitration Two will not in anyway nullify or impair the Arbitration One decision. The interpretation of Section 10(a) does not depend upon whether Amtrak was negligent or grossly negligent; it depends upon whether "arising out of MARC Service" only applies if the MARC train was negligent, as MTA argues, or whether it applies irrespective of fault, as Amtrak argues. It would not seem therefore that Amtrak's Section 10(a) claim would be a compulsory counterclaim even under the Restatement definition. The Court of Appeals in the case of *Batson v. Shifflett*, 325 Md. 684, 706, 602 A.2d 1191, 1202 (1992) held that, even in judicial actions collateral estoppel [or *res adjudicata*] or issue preclusion only apply "where the identical issue sought to be litigated was actually determined in the early proceeding." *Id.* In *Batson*, the Court stated,

> If anything is left to conjecture as to what was necessarily decided there can be no collateral estoppel. It must appear that the precise issue was raised and resolved in the former proceeding.

*Batson* at 706, 1202.

The even bigger problem with MTA's argument is that Arbitration One was not presented to a *court* of competent jurisdiction, and neither is Arbitration Two. Arbitration is strictly a creature of contact and depends for its very existence upon the Operating Agreement. Section 22 of the Operating Agreement reads, in pertinent part, that "[a]ny dispute, claim or controversy between the parties...shall be submitted to binding arbitration...." *Operating Agreement, Joint Stip., Ex. B at 35*. The clear intention of Section 22 is to provide an expedient and cost effective resolution of disputes between MTA and Amtrak. Amtrak, in its Pre-Hearing Response Brief states that, "[t]he parties quite specifically agreed not to resolve that dispute in a judicial proceeding, which would have subjected the matter to judicial standards concerning claim preclusion that need not and should not apply to this contract dispute." *Amtrak's Resp. to*

5

*MTA's Pre-Hearing Brief at 3.*  In many cases the arbitration of only a part of the controversy in the hope that other matters can be amicably agreed upon by the parties saves time and money. [3] Amtrak's counsel at oral argument explained to the panel that Amtrak did not submit the Section 10(a) insurance demand to arbitration because it was hopeful of resolving the whole matter by prevailing in Arbitration One.  In fact, the Operating Agreement, specifically provides that, when a dispute arises under Section 9 as to whether Amtrak's gross negligence caused an accident, "such dispute shall be resolved separately pursuant to Section 22...."  *Operating Agreement, Joint Stip., Ex. B at 19.*  This is solely what Arbitration One accomplished.  Section 22(f) of the Operating Agreement provides that an arbitration panel's decision is "final and binding upon the parties."  *Id. at 36.*  It is, of course, only final and binding upon the issue actually submitted and determined.  In the case of *Ferris v. Polansky*, 191 Md. 79, 84-85, 59 A.2d 749, 752 (1948), the Court of Appeals observed that "[w]hen parties to a valid contract refer any question of performance to the decision of one of them or a third person, the decision contracted for is final...[b]ut it is only the decision contracted for that is final."  *Id.*

For the foregoing reasons, the panel concludes that Amtrak's demand for insurance coverage under Section 10(a) of the Operating Agreement is not barred by *res adjudicata*, collateral estoppel or any other form of judicial preclusion.

### 3.     *Amtrak's demand for coverage under Section 10(a) of the Operating Agreement should not be denied on the basis of judicial estoppel.*

MTA in its Pre-Hearing Brief argues that "[p]ermitting Amtrak to belatedly assert the Amtrak Insurance Claim would be contrary to equity because Amtrak intentionally did not raise it in a timely manner, and MTA relied to its detriment on Amtrak's decision not to raise the issue

---

[3]   *See Dissent, n.3.*

at all in Arbitration One.  The doctrine of equitable estoppel has no application whatsoever to this arbitration proceeding.  There are three elements necessary to create an equitable (judicial) estoppel:  (1) some conduct or representation, intentional or unintentional, that causes the other party to be misled, (2) reliance on that conduct or representation, and (3) detriment.  Not one, but all three of these elements are missing in the instant case.  Amtrak, in seeking an arbitration interpretation of Section 10(a) of the Operating Agreement in Arbitration Two.  In accordance with the Operating Agreement, it has every right to seek such a determination.  Amtrak's conduct is not inappropriate nor is it such that MTA should have been misled.  MTA was certainly sophisticated enough to realize that a determination of gross negligence under Section 9 would not necessarily resolve its obligations under Section 10(a).  MTA was obviously aware of the Maryland Court of Appeals decision in *Mass Transit Admin. v. CSX Transp. Inc.*, 349 Md. 299, 708 A.2d 298 (1998) and could not, or at least should not, have been surprised by Amtrak's claim for insurance in accordance with Section 10(a) of the Operating Agreement.  In fact, had it desired, MTA could have requested the Arbitration One panel to decide its obligations under Section 10(a).  It apparently chose, however, not to advance any such arguments in Arbitration One, instead solely arbitrating indemnity issues under Section 9 relative to gross negligence.  Therefore, MTA has no right to try to forbid Amtrak from making a claim under Section 10(a) for insurance coverage in this proceeding.  In light of the *CSX* opinion, MTA should have been fully aware of Amtrak's right to seek such a determination.

Finally, the failure to arbitrate the Section 10(a) claim in Arbitration One has not been detrimental to MTA.  The same arguments now raised in Arbitration Two, would have been raised in Arbitration One.  Even if having two hearings, rather than one, has caused the

7

arbitration to be more costly (and it probably has not), this is not the detrimental injury that is contemplated by the cases that have applied equitable estoppel.

For the foregoing reasons, the panel concludes that Amtrak's demand for insurance coverage under Section 10(a) of the Operating Agreement is not barred by equitable estoppel, judicial estoppel, collateral estoppel or any other form of judicial preclusion.

## 4.    Amtrak's claim under Section 10(a) of the Operating Agreement is not barred by its failure to give a timely notice.

MTA contends that the notification provided by Amtrak to MTA was not properly given and constitutes a breach of Section 11 of the Operating Agreement. It argues that "MTA, as the putative insurer under a liability insurance policy, would have both the right to control any defense relating to any claim covered by the policy and the duty to provide that defense." *MTA's Pre-Hearing Brief at 14* (citing *Sherwood Brands, Inc. v. Hartford Accident and Indemnity Company*, 347 Md. 37, 43, 698 A.2d 1078, 1083 (Md. 1997)). However, Section 11 of the Operating Agreement, stating to contrary, provides that, "Amtrak will handle the investigation and settlement of all claims arising out of the MARC Service." *Operating Agreement, Joint Stip., Ex. B at 22.* MTA's reliance on *Sherwood Brands* is misplaced. Even if Amtrak's notice was untimely, which it was not, MTA has not been prejudiced by the delayed notice, and prejudice is at the very heart of the *Sherwood Brands* opinion. MTA argues that it has been prejudiced by now having to defend against the Section 10(a) claims. However, MTA's position is untenable as it would have had to defend against Section 10(a) claims no matter when the notice was given.

MTA's contention that Amtrak failed to give timely notice under Section 11 of the Operating Agreement and that Amtrak should therefore be barred from presenting its Section 10(a) claim is without merit. This is not any more evident then when reviewing the

8

specific language of Section 11. Section 11 specifically states that, "Amtrak shall promptly notify the Administration of any accident or injury that Amtrak reasonably believes may lead to a substantial claim for which the Administration may be responsible." *Operating Agreement, Joint Stip., Ex. B at 22.* MTA has not, and cannot, claim that they did not receive prompt notice of the subject accident and resulting injuries. Nor can MTA claim that notice was not given that indemnification may be sought, through arbitration, in accordance with Section 9 of the Operating Agreement.

MTA's only claim is that Amtrak did not "promptly" notify them that it would be making a claim for insurance pursuant to Section 10(a) of the Operating Agreement. However, nowhere in Section 11 and/or any other part of the Operating Agreement is there a requirement that Amtrak specifically provide "reasonable notice" to MTA that they may seek insurance coverage in accordance with Section 10(a) of the Operating Agreement. In fact, all Section 11 requires is that, "Amtrak shall give reasonable notice to the Administration of receipt of any complaint, if Amtrak contends the allegations are covered by the indemnification agreement set forth in Section 9 hereof." *Operating Agreement, Joint Stip., Ex. B at 22.* MTA did not, and could not, raise lack of "reasonable notice" in Arbitration One and their attempt to do so here is without merit or justification under the Operating Agreement.

For the foregoing reasons, the panel concludes that Amtrak did not waive its right to make a claim under Section 10(a) of the Operating Agreement and has properly done so in Arbitration Two.

5. *The June 17, 2002, railroad collision did "arise out of the MARC Service".*

The June 17, 2002, train collision was caused by the gross negligence of Amtrak's engineer. This was decided by the Arbitration panel and is binding upon the parties. It is also clear that the MARC train that the Amtrak train struck was not negligent nor did it cause this collision.

Section 10(a) of the Operating Agreement provides in effect that the Administration shall procure and maintain liability insurance with Amtrak and the Administration as named insureds to cover liability for injury or death of persons and damage to property, including coverage for punitive or exemplary damages, "arising out of the MARC Service." MTA contends that since the MARC train was not negligent, it did not cause the collision and hence the collision did not "arise out of the MARC Service." Amtrak, on the other hand, argues that the Maryland Court of Appeals specifically rejected this contention in *Mass Transit Admin. v. CSX Transp. Inc.*, 349 Md. 299, 708 A.2d 298 (1998) and instead held that the phrase "arising out of" should be broadly construed and applied without regard to proximate or concurrent cause.

In an effort to distinguish the instant case from *CSX*, MTA argues that there are different intentions involved and refers in its Pre-Hearing Brief to the case of *Philadelphia Indem. Ins. Co. v. Md. Yacht Club, Inc.*, 129 Md. App. 455, 469, 742 A.2d 79, 88 (Md. Ct. Spec. App. 1999), in which the Court stated

> To be sure, the phrase "arising out of" is used frequently in insurance contracts, and has been the subject of prior interpretation by Maryland courts. *See CSX Transp., 349 Md. 299, 708 A.2d 298,* and cases cited therein. Nevertheless, it does not have a single, "settled meaning" that applies to every insurance policy. Contractual language cannot be construed in a vacuum. Thus, language used in one contract may carry a different meaning in another; we construe such phrases "on a contract by contact basis, and not by sweeping language saying that regardless of the exact provisions of the contract we shall interpret all similar, but not identical, contracts alike.

*Id.* at 469, 86.

MTA argues that since Section 9 "Risk of Liability" of the Operating Agreement provides that MTA is obligated to indemnify Amtrak, "irrespective of negligence or fault of Amtrak or such third parties, for all damage and liability for personal injury or death, or property damage which would not have been incurred <u>but for the existence of the MARC Service provided by Amtrak</u>," this panel should not interpret the "arising out of" phrase of Section 10(a) as having the same "but for" meaning. *MTA's Pre-Hearing Brief at p. 19.* Judge Eldridge, in his dissenting opinion in *CSX*, complains that "[t]he majority bases its decision on its conclusion that the phrase 'arise out of' means nothing more that simple 'but for' causation." *CSX* at 323, 310. The majority in *CSX* rejected Judge Eldridge's narrow interpretation in favor of a broader one. This panel cannot ignore the *CSX* decision which is the law of Maryland based upon the mere speculation that the parties may have intended something different than what was intended in the MTA-CSX agreement. Even without the benefit of *CSX*, the usual, ordinary accepted meaning of "arising out of MARC Service" would favor a broad interpretation and not one dependent upon fault or proximate cause.

MTA's argument amounts to an attempt to apply a narrow interpretation of the language "arising out of." This type of analysis was rejected in *CSX*. The Court in *CSX* specifically opined that "the phrase 'arising out of' in an insurance context is to broadly read the phrase to mean originating from, growing out of or flowing from the object or instrumentality to which the phrase refers, <u>without any limitation imposed by proximate cause or concurrent cause analysis</u>."

---

[4] The dissent is based in part upon MTA's argument that the majority's findings as to the phrase "arising out of" is inconsistent with the operation of the Contract. While arguing that this Opinion creates a "new agreement," the dissent fails to address the plain language of the existing Contract, including requirements under Section 10 for the provision of insurance for acts giving rise to punitive or exemplary damages. Instead, the dissent relies solely upon Maryland law on the interpretation of "arising out of" in an attempt to make the requirements of Section 10 subject to the provisions of Section 9, in a manner that is unsupported in the text of the Contract. For the reasons stated herein, the panel finds MTA's legal arguments for such reformation of the Contract unpersuasive.

*Amtrak's Response Brief at 23* (citing *Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299, 311-12, 708 A.2d 298, 304-05 (1998)). To interpret the phrase "arising out of" otherwise, merely because the phrase "but for" exists in the same contract, would require a strained interpretation of the accepted meaning of "arising out of" as defined in *CSX*.

Furthermore, to accept MTA's argument this panel would have to ignore the judicially reasoned opinion put forth in CSX and its progeny. However, this panel is unwilling to ignore the accepted, reasoned and broad interpretation of the phrase "arising out of." This panel is of the opinion that the subject accident, while not the fault of MARC, certainly occurred and/or "arose out of" the use of the tracks by MARC. Stated another way, had there not been a contract between Amtrak and the MTA which provided for the use of the tracks by the MARC service, a MARC train would not have been on the tracks at the time of the subject accident and, hence, the subject accident would not have occurred. Therefore, MTA's argument, especially in light of *CSX*, is unfounded

For the foregoing reasons, the panel concludes that Amtrak's claim for insurance coverage under Section 10(a) for the train collision of June 17, 2002, did "arise out of the MARC Service".

### *Conclusion, Decision and Award*

For the foregoing reasons, it is the Decision and Award of this Panel on this 19th day of October 2004, Arbitrator Spitulnik dissenting with a separate expression, that:

1.    Section 10(a) of the Operating Agreement requires MTA to provide insurance coverage for (1) injuries to passengers on both the Amtrak and MARC trains, (2) injuries to the employees of the Amtrak train, and (3) the property damage to the MARC train that resulted from the train collision of June 17, 2002.

12

2.    That the assessment of those injuries and damages is deferred, in accordance with the agreement of the parties.

FOR THE PANEL:

_____/s/_____
William C. Miller, Arbitrator

_____/s/_____
Joseph S. Crociata, Arbitrator

## DISSENT OF CHARLES A. SPITULNIK

This panel is charged by the parties' agreement and by governing law to interpret the agreement presented to us, and to follow the law. The opinion of the majority of this panel does neither. It creates a new agreement, rather than interpreting the one presented to us, and disregards the law of the State of Maryland as to *res judicata.* For these reasons, I respectfully dissent.

*Background*

This dispute relates to a contract between the Maryland Mass Transit Administration (now referred to as the Maryland Transit Administration) ("MTA") and the National Railroad Passenger Corporation ("Amtrak"), dated January 1, 1994 (the "*1994 Agreement*")(A copy of the *1994 Agreement* is attached to the Joint Stipulation submitted by the parties as Exhibit B.). MTA and Amtrak had previously arbitrated under that agreement the question whether the conduct of an Amtrak engineer in causing an accident on June 17, 2002 constituted "gross negligence,"

13

thereby shifting the indemnification obligation for costs incurred as a result of that accident from

MTA to Amtrak. The decision in that earlier arbitration included the following conclusion:

> Finally, there is on this record no evidence of any fault on the part of
> MTA. The panel finds that all damages resulting from the Collision are
> attributable to the gross negligence of Amtrak ....
>
> ... [I]t is the Decision and Award of the Panel, Arbitrator Goerwitz
> dissenting with a separate expression, that:
>
> 1.   The Collision resulted solely from Amtrak's
>      gross negligence....

*Amtrak v. Maryland Transit Administration*, Cole, E., Neutral Arbitrator, decision dated

September 22, 2003 (hereinafter "*Arbitration I*") at 11. As a result, the panel required Amtrak to

bear all of the costs associated with that accident. *Id.*

This decision precipitated an exchange of correspondence between Amtrak and MTA in

which Amtrak asserted that MTA was obligated as Amtrak's insurer under Section 10(a) of the

Agreement to cover certain of the costs Amtrak incurred as a result of that collision.[5]

Section 10(a) of the Agreement states, in pertinent part:

> The Administration shall procure and maintain for the duration of this
> agreement, liability insurance ... with Amtrak and the Administration
> designated as the named insured. Such insurance shall cover the Named
> Insureds' liability for injury or death of persons and damage to property,
> including coverage for punitive or exemplary damages arising out of
> MARC service...The Administration shall have the right to self-insure for
> any part of the insurance procurement up to $5,000,000 per occurrence...

*1994 Agreement* at 20.

Reviewing the language of the agreement and governing law in the State of Maryland,

MTA concluded that the losses for which Amtrak was seeking coverage did not "arise out of" the

MARC Service. Keying off the decision in *Arbitration I*, MTA asserted that the losses were

---

[5] The parties have expressly reserved for another day the question of the amount of claims, if any, that are covered
by the MTA's asserted obligation.

caused directly by Amtrak's employee's grossly negligent conduct and thus "arose out of" that conduct. As a result, MTA asserted, its alleged insurance obligation was not triggered.

Amtrak's attempt to trigger that obligation flowed from its view, highlighted in the briefs in this proceeding, that "arising out of" in Section 10(a) means "but for" - - that is, if the accident would not have happened and the costs incurred but for the presence of the MARC train at the time that the Amtrak engineer elected to take action inconsistent with the signals she received as she proceeded northward, the asserted insurance obligation requires MTA to cover Amtrak's losses. Amtrak's "but for" interpretation of Section 10(a) seems to suggest that the MARC train was in the wrong place at the wrong time, but that because it was there at all the insurance obligation is triggered.

The majority accepts this argument even though the language of the *1994 Agreement* confirms that the parties did not mean "arising out of" to mean "but for." Although the rights and obligations created by Section 9 of the *1994 Agreement* are not at issue in this arbitration, the language the parties used there is pertinent to my view that the majority has not decided this case based on the bargain the parties struck, but instead has made a new one for them and reached a decision based on that new agreement. Section 9, which was the subject of the proceedings that led to the decision in *Arbitration I*, states in pertinent part the following:

> Except as provided in the second paragraph hereof, the Administration agrees to indemnify and same harmless Amtrak … irrespective of negligence or fault of Amtrak … for all damage or liability for personal injury, death, or property damage which would have been incurred <u>but for the existence of the MARC Service</u> provided by Amtrak ….. The Administration's agreement to indemnify and save harmless Amtrak … shall not apply to claims for damages … (a) which is caused by the gross negligence, or willful and wanton misconduct of Amtrak, as agreed to by the parties or determined by arbitration….

*1994 Agreement* at 18.

15

*The "Arising Out Of" Language*

The majority begins its analysis of the meaning of "arising out of" with the decision of the Maryland Court of Appeals in *CSX Transp., Inc. v. Mass Transit Admin.*, 708 A. 2d 298 (Md. 1998) ("*CSX v. MTA*"). The Court there concluded, in a decision four years <u>after</u> MTA and Amtrak struck the bargain that is the subject of this arbitration, that in an agreement between MTA and CSX Transportation, Inc. ("CSXT"), the phrase "arising out of" does in fact mean "but for." For the majority the clock stops there, meaning that in the *1994 Agreement* and any other time the phrase "arising out of" appears in a contract, the result must be the same and that phrase must be interpreted to mean "but for" causation. However, for the Maryland Court of Appeals, time moved on and a subsequent decision confirmed that each contract must be reviewed on its own. In *Philadelphia Indem. Ins. Co. v. Md. Yacht Club, Inc.*, 742 A.2d 79, 88 (Md. Ct. Spec. App. 1999), the Court of Appeals stated the following:

> To be sure, the phrase "arising out of" is used frequently in insurance contracts and has been the subject of prior interpretation by Maryland courts. *See CSX v. MTA, supra* and cases cited therein. Nevertheless, it does not have a single "settled meaning" that applies to every insurance policy. Contractual language cannot be construed in a vacuum. Thus, language used in one contract may carry a different meaning in another; we construe such phrases on a contract by contract or case by case basis, and not by sweeping language saying that regardless of the exact provisions of the contract we shall interpret all similar, but not identical contracts alike.

*Id.* at 87.

The current arbitration presents a contract that bears some important similarities to the one under review in *CSX v. MTA*. One of the parties is the same, the contracts involve commuter rail service, and the words "arising out of" appear. However, there is one important difference. In the *1994 Agreement*, one section uses the words "arising out of" and in another the words "but for" appear. In the MTA-CSX Agreement, only "arising out of" appeared in the pertinent

16

sections. Clearly, when the parties to the *1994 Agreement* meant to require use of a "but for" causation analysis, they knew how to and did in fact use the words "but for".

The majority, disregarding the fundamental rule that arbitrators interpret the contract that is put before them, has chosen to tell the parties that they really meant to say "but for the MARC Service" in Section 10(a). Even though the Maryland Court of Appeals has specifically concluded that "arising out of" need not necessarily mean "but for" in every agreement and that every agreement must be reviewed on its own, and even though the parties made a conscious choice to apply something other than a "but for" causation analysis in Section 10(a), the majority here redrafts the agreement by erasing "arising out of" and writing in "but for".

The majority dismisses MTA's argument as to the parties' intent that "arising out of" means something other than "but for" causation as "mere speculation that the parties may have intended something different than what was intended in the MTA-CSX agreement." To the contrary, this is not mere speculation. The parties said it clearly within the four corners of the document presented to this panel as the basis for its decision. By using "but for" in one place and "arising out of" in another, the parties were very clear that two different causation analyses must be applied when determining their rights and obligations under sections 9 and 10 of the Agreement. No speculation is required; merely reading the *1994 Agreement* provides that instruction to this panel.

The *1994 Agreement* confers upon this panel the authority to "hear and decide" ... "any dispute, claim or controversy between the parties hereto relating to the interpretation, application, or implementation of this Agreement." *1994 Agreement*, Section 22 at 35 and Section 22(d) at 36. It does not give the panel the authority to re-write one section of the agreement. The parties' clear intent here was to have "arising out of" mean something other than

17

"but for". The use of the different phrases in different places permits no other conclusion. The majority disregards that, and substitutes its own words in Section 10(a) for that of the draftsmen of and parties to this Agreement. I cannot subscribe to that action because by taking it, the majority exceeds the authority conferred upon this panel by the *1994 Agreement.*

## Res Judicata

The majority opinion contains another major error. The conclusion that *res judicata* does not apply in this context and prevent Amtrak from collaterally attacking the first arbitration panel's decision, flies in the face of both the stated policy of the courts in the State of Maryland and the intent of the parties to the Agreement. The *1994 Agreement* requires the parties to submit all disputes to arbitration, and states that the award of the arbitration panel is final and binding. Under the law of the State of Maryland, a final and binding decision is one that embraces all the issues that were raised and that could have been raised in that proceeding *Warwick Corp. v. Md. Dep't of Transp.*, 573 F. Supp. 1011 (D. Md. 1983). Amtrak does not contend that it could not raise the issue of the insurance coverage under Section 10(a) in the earlier arbitration proceeding. Rather, Amtrak's counsel admitted at the hearing in this proceeding that Amtrak simply did not think it would lose the first case. As a result, apparently, Amtrak decided not to present all issues that would have brought finality to the claim it presented in that earlier proceeding. The absence of any new facts in this hearing, only legal arguments based on what happened (or more important, did not happen) in the 2002 accident and the first arbitration hearing that it spawned, confirms the direct, close, and inseparable nexus between this proceeding and *Arbitration I.* Yet, the majority does not believe that applicable law, public policy or the parties' agreement required Amtrak to resolve all issues related to that accident in one proceeding.

18

The majority's reliance on *Ferris v. Polanski*, 191 Md. 79 (1948) is not persuasive. While the parties ought not to be permitted to relitigate the precise issues that were decided in the earlier proceeding, *Ferris* does not obliterate the plethora of case law cited to this panel by MTA that makes it clear that the principles of *res judicata* go beyond issue preclusion, and encompass all matters that could have and should have been decided the first time around.

The "resolved separately" language in Section 22, relied upon by Amtrak and accepted by the majority, should not bring this panel to a different result. As MTA explained in its brief and at the argument, that clause when read in the context of the paragraph and entire section in which it appears, is very clearly intended to prevent MTA and Amtrak from presenting issues that arise between themselves as to indemnification in a judicial proceeding brought by a third party against both of them. *1994 Agreement*, Sec. 9, para. 3 at 19. Read in the context of the entire section and the entire Agreement, this language makes sense. It confirms that disputes between these two parties are to be resolved through arbitration and not otherwise, and that they should be handled separately from claims of third parties. Read as Amtrak and the majority have done, on the other hand, it does not.

Amtrak did not take the necessary care to make sure that all issues related to the 2002 accident were raised in that first proceeding. Contrary to the law and practice in Maryland, this panel has elected to give Amtrak a second bite at the apple. The majority appears to believe that the "final and binding" language in Section 22 of the *1994 Agreement* is aspirational, not mandatory. Once again, I can not subscribe to that view.

For these reasons, I respectfully dissent.

_____/s/_____
Charles A. Spitulnik, Arbitrator

19